IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| CANDACE COFFEY-WATSON, | ) | Civil Action No. 3:09-1479-HFF-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB and SSI on May 16, 2005, with an alleged onset of disability ("AOD") of February 1, 2005. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge (the "ALJ").

Plaintiff appeared and testified at a hearing held on January 22, 2008, at which a vocational expert (VE), also appeared and testified. On April 17, 2008, the ALJ issued a decision finding Plaintiff was not disabled because, based on Plaintiff's residual functional capacity and the testimony of the VE, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. See 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

Plaintiff was 52 years old at the time of the ALJ's decision. (Tr. 23). She has more than a 12th grade education with past relevant work as a park aide, sales manager, and video store manager. Plaintiff initially alleged disability due to "Back problems." (Tr. 99).

The ALJ found (Tr. 16, 18, 23, 25):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lower back pain, neck pain, and migraine headaches (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she may only occasionally stoop, crouch, and climb stairs or ramps; may never climb ladders; and may work only in an environment reasonably free from extremes of temperature and humidity. By reason of her migraine headaches, she is further restricted to simple, routine tasks, in a supervised environment, and not involving required interaction with the general public or team-type interaction with co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 21, 1956, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). She is now 52 years old.

8. The claimant has more than a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

    transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On April 10, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 4), thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff then filed this action on June 5, 2009.

## SCOPE OF REVIEW

The Act provides that DIB[1] shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[2]

---

[1]Eligibility requirements for SSI differ, *see* 42 U.S.C. § 1382, but are not an issue in the case sub judice.

[2]The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in part 404. All of the undersigned's regulatory references are to the 2008 version of the C.F.R.

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support

the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

In her brief before the court, Plaintiff alleges that the ALJ erred when evaluating both her residual functional capacity ("RFC") and her credibility. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

**A.     RFC**

Plaintiff objects to the ALJ's determination that the medical evidence did not support her alleged limitations. After making his RFC finding, the ALJ summarized Plaintiff's testimony. (Tr. 18-19; see generally Tr. 31-63). Plaintiff's primary problems are lower and upper (neck) back pain and migraine headaches.[3] Her back pain caused her difficulty with walking and getting out of bed. She has undergone radiofrequency application ("RFA") for treatment of her pain, but it has helped only little, as have prescription medications.

Plaintiff's migraines last as long as four to six days and occur about every other week. She receives injections for her migraines if they last more than three days, but she first tries oral medications. Plaintiff goes to the emergency room about once per month for an injection, and for the last one and a half years, none of her migraines have resolved in less than three days.

Plaintiff asserts that she is not able to sit or stand for more than fifteen to twenty minutes, then must change position. She has difficulty lifting a gallon of milk and must use both hands when lifting it. Plaintiff cannot walk with her granddaughter the one block to the bus stop and therefore drives,

---

[3]The undersigned notes that Plaintiff's numerous submissions to the state agency generally fail to mention migraine headaches. (See Tr. 98-161). Moreover, she testified that she stopped working "[m]ainly" because of her back pain (Tr. 35), although she stated on her Disability Report that she "was fired because [she] could not take any time off" (Tr. 99).

5

but on a "bad" day, her husband takes the child. After returning to her home from the bus stop, she reclines, and her husband fixes breakfast. Plaintiff drove herself and her husband during the hour-long trip to her hearing.

In reviewing the objective findings of Plaintiff's impairments (Tr. 19-22), the ALJ noted that, as of January 19, 2005 (not two weeks before her AOD), Plaintiff had never tried physical therapy. (See Tr. 191). Orthopedist Anthony Afong's examination on that date revealed negative straight leg raising[4] (i.e., no nerve root irritation in the low back) and no spinal tenderness. (Tr. 192). The ranges of motion for her neck and all four extremities were within functional limits; her lumbar spine range of motion was somewhat reduced. Plaintiff's gait was normal.[5] Her x-rays showed only age-appropriate spondylosis (ankylosis[6] of the vertebra). (See Tr. 193).

Two weeks after her AOD, Plaintiff underwent magnetic resonance imaging ("MRI") of both her lumbar and cervical spines. (Tr. 196-99). The lumbar study showed minimal bulging with no stenosis[7] at levels L4-L5 and minimal bulging with facet arthropathy[8] at L5-S1. (See Tr. 183). The cervical study revealed mild osteophytes[9] at C5-C6 and C6-C7 without stenosis.

---

[4]This finding was typical of Plaintiff's examinations. (See, e.g., Tr. 183, 188, 309, 346).

[5]In spite of Plaintiff's alleged difficulties with leg functioning (see, e.g., Tr. 119-22, 150), her caregivers consistently found her gait to be normal (e.g., Tr. 187, 189, 316, 339).

[6]"Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." Stedman's Medical Dictionary 90 (27th ed. 2000) [hereinafter Stedman's].

[7]"A stricture of any canal or orifice." Stedman's, supra, at 1695.

[8]"Any disease of a joint." Stedman's, supra, at 150.

[9]"A bony outgrowth or protuberance." Stedman's, supra, at 1285.

When Plaintiff consulted with surgeon Devin Datta in May 2005, his exam showed some tenderness but, again, negative straight leg raising. (Tr. 183). After review of Plaintiff's MRI studies, Dr. Datta concluded that surgery was not warranted.

Before moving to South Carolina from Florida, Plaintiff saw neurologist Khaled Kamel in Aiken, with complaints of upper and lower back pain and radiation into her right extremities. (Tr. 232-34). Upon his recommendation, Plaintiff underwent nerve conduction and electromyograph studies of her extremities, but these were normal. (See Tr. 231). Dr. Kamel revised Plaintiff's diagnosis from possible cervical radiculopathy and carpal tunnel syndrome to musculoskeletal pain with "[n]o nerve or muscle damage appreciated." (Compare Tr. 234 with Tr. 231).

Plaintiff argues that "the ALJ's consideration of the evidence was at least somewhat selective, and ignored or mischaracterized key evidence supporting her allegations." (Pl.'s Br. 20). She first points to his summary of the MRI findings, but the ALJ's synopsis is taken from Dr. Datta's records:

> The cervical MRI shows some mild degenerative disk changes at the C5-C6 level but no significant central or foraminal narrowing. MRI of the lumbar spine shows some degenerative disk changes at L4-L5 and L5-S1 of a mild degree, no significant central or foraminal narrowing is seen. There is some facet hypertrophy noted at L5-S1.

(Tr. 183). The undersigned can certainly find no fault with the ALJ using a neurosurgeon as his source of information. The ALJ is, for medical purposes, a layman, and rightly relied upon an expert's interpretation of medical studies. See, e.g., Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) ("[A]n ALJ, as a lay person, is not qualified to interpret raw data in a medical record.").

The same can be said of Plaintiff's apparent complaint that the ALJ failed to recognize her diagnosis of radiculopathy. Dr. Datta, the neurosurgeon, who did review Plaintiff's MRIs, assessed

7

her with mild degenerative disc disease of her cervical and lumbar spine, chronic neck and bilateral arm pain, and chronic low back and leg pain. (Tr. 183). Further, the ALJ acknowledged that a physician's assistant with Dr. Datta's practice diagnosed Plaintiff with lumbalgia (lower back pain) with radiculopathy and cervicalgia (neck pain) with radicular complaints secondary to degenerative disk disease. (Tr. 19 (citing Tr. 190)). The ALJ added that Dr. Kamel, a neurologist, changed his diagnosis from possible right cervical radiculopathy to musculoskeletal pain without nerve or muscle damage. (Tr. 20 (citing Tr. 231)). Again, the undersigned finds no error:

> In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, as was *not* the case here, is not a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole."

Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (citation omitted; alterations in original); see also Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Plaintiff next claims that the ALJ erred because the ALJ's finding that her lower back pain and neck pain constitute "severe" impairments (Tr. 16) is not reflected in limitations on sitting, standing, or walking. An impairment, however, is to be found "severe" upon a minimal showing: "At step 2 of the sequential evaluation process, . . . an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling (SSR) 96-3p, 61 Fed. Reg. 34,468-01, 34,469. "Basic work activities" are not restricted to sitting, standing, and walking but include, among others, lifting and carrying. See 20 C.F.R. § 404.1521(b).

8

The ALJ found that Plaintiff's severe impairments were lower back pain, neck pain and migraine headaches. Any physical limitations he included in her RFC assessment would likely be attributable to her complaints of lower back and neck pain. In the ALJ's hypothetical to the VE (see Tr. 63-64), which Plaintiff specifically addresses, the undersigned finds the following limitations:

- "No lifting or carrying over 20 pounds occasionally, 10 pounds frequently."[10]
- "Only occasional stooping, crouching, and climbing of stairs or ramps."
- "No climbing of ladders."

(Tr. 63). Clearly, the ALJ did attribute some limitations to Plaintiff's severe impairments of neck and low back pain. Additionally, as pointed out by the ALJ (Tr. 23), none of Plaintiff's caregivers suggested specific functional limitations for her.

Moreover, in addition to the limited nature of Plaintiff's objective findings, the ALJ relied on, inter alia, caregivers' reports of improvement with treatment (e.g., Tr. 170 (chiropractic treatment decreased pain, spasms and tenderness, increased range of motion); Tr. 183 (injections provided "significant improvement" in low back symptoms); Tr. 255 (after RFA, lumbosacral pain and range of motion improved; headaches decreased; cervical range of motion improved); Tr. 281 (RFA has "completely resolved" left low back pain); Tr. 309 (RFA to right low back helped "tremendously"); Tr. 345 (after RFA, neck pain and headaches better)); and periods during which she took only over-the-counter medications for pain (e.g., Tr. 403 (moderate control of back pain with Motrin)).

Plaintiff also complains that the ALJ failed to provide for the debilitating nature of her headaches, which would cause frequent work absences and incapacitation during a workday. But,

---

[10]"Heavy" work, on the other hand, involves lifting 100 pounds at a time, with frequent lifting or carrying up to 50 pounds. 20 C.F.R. § 404.1567(d).

9

the ALJ discounted Plaintiff's claims as to her migraines, because "the available records do not support the frequency of visits she claimed." (Tr. 21).

According to Plaintiff's testimony, at times her migraines can last for four to six days and can occur as often as every other week. (Tr. 36). When asked by the ALJ if any of them lasted "a shorter period of time," Plaintiff answered no: "They've been at least three days for the last year and a half." (Tr. 53). Plaintiff added that her migraines occurred "[a]bout every other week." (Tr. 44; see also id. ("They happen about every other week.")). It was "very rare" that she would go three weeks without a migraine. (Id.). Plaintiff also testified that she would go to the hospital[11] after the third or fourth day of her headache[12] (Tr. 44), and (although she was averaging two per month) she was going to the hospital at least once per month (Tr. 53).[13]

---

[11]Plaintiff earlier clarified that she would go to the hospital's *emergency room* for her injections. (See Tr. 52.)

[12]Plaintiff explained that she waited so long because Diana Aranda, her primary care physician, told her to try her oral medications first. (Tr. 53-54). Yet there is no showing that Dr. Aranda treated Plaintiff prior to March 2007. (See Tr. 339).

[13]The ALJ was never quite able to pin Plaintiff down on this point:

Q: [L]ately in the last couple of years *have you had to go every time* –
A: Yes, sir.
Q: – you had a migraine? Okay. That would be for the last –
A: About two to three years.
Q: Okay. And you say you go once a month, *so it's about once a month that you have the really bad migraines then*?
A: Yes, sir.
Q: Not anymore than that?
A: Most of the time I can control them with the Imitrex but once the Imitrex does not work then I have to go get an injection with –
Q: And you've had –
A: – Delotid [sp].
Q: – to do that *with every migraine* for the last two or three years?
A: Yes, sir.

(continued...)

Plaintiff's medical records, however, do not support her testimony. As the ALJ pointed out, the transcript reveals only seven emergency room visits from Plaintiff's AOD through the date of the ALJ's decision. Those records reveal further details as follows (emphases added):

| Date/ Pages | Record Notations |
|---|---|
| **10/08/06; Tr. 371-75** | Headache since 3:45 a.m. *today*. Received injection at 4:02 p.m. Left hospital 28 minutes later, "walking upright [with] steady gait." "Get our Imitrex prescription filled and take as directed for migraine." |
| **12/22/06; Tr. 360-64** | Headache *since 5:00 a.m.* After "[w]aiting on [medication] from pharmacy," given initial injection at 9:17 a.m. Given rest of medication at 10:31 a.m. Discharged at 10:58 a.m.; pain =5/10. |
| **02/07/07; Tr. 350-53** | Headache for 3 days. Imitrex did not help. Discharged 25 minutes after received injection: "[Patient] to wait 20 min[utes] to [discharge] per protocol." At discharge, headache was "'beginning to get better.'" |
| **05/27/07; Tr. 304-08** | Migraine *started last night*; worse after awakening this morning. *Out of imitrex* but "[d]oesn't want any [prescription] to go." Received shot at 12:00 p.m. At 12:45, "feeling better & asking to be discharged home." |
| **07/22/07; Tr. 286-90** | Gradual onset of migraine *night before last*. Arrived at hospital at 3:18 p.m., but no room until 5:31 p.m., and did not receive injection until 7:00 p.m. Yet, by 7:36 p.m, had asked to go home and was discharged. |
| **09/26/07; Tr. 267-71** | 3-day migraine. Arrived at hospital at 12:43 p.m.; taken to room at 1:10 to await evaluation; injection given at 3:18. At 3:40 p.m., said pain was "much better" and left without being seen by doctor or being discharged. |
| **10/10/07; Tr. 258-60** | "Woke up with a little [headache] *this morning*. Stayed about the same between 8:30-4:00 got acutely worse[.]" *Tried pain medication at 2 p.m.* with no relief. Arrived at hospital at 6:11 p.m. Unable to be evaluated until 8:00 p.m. Received injection at 9:50 p.m. and asked to leave. Discharged at 10:20 p.m. with no pain. |

---

[13](...continued)
(Tr. 58-59)(emphasis added). The ALJ ultimately concluded, "[S]he did originally say every – but your – it really seemed to me after asking her some individual questions that she got around to once a month. She needs an injection every time she has a headache now in the last two or three years and she goes once a month approximately, so –." (Tr. 66). On the other hand, in June 2006, Plaintiff told a general practitioner that her migraines occurred "intermittently," sometimes "two to three months apart." (Tr. 403). The reading of Plaintiff's testimony most favorable to her would be that she has two migraines per month, but only half of them require an injection. Even so, her medical records do not support her statements.

Clearly, these records support the ALJ's decision to discount Plaintiff's testimony regarding her migraines. The VE testified that three or more absences per month would preclude employment, but Plaintiff's emergency room records do not establish that she would be absent at least three days per month. Consequently, Plaintiff has not shown that the ALJ erred in excluding absenteeism for emergency room visits from her RFC.[14]

Moreover, as the ALJ pointed out, there were "significant periods when [Plaintiff] was not treated by any medical source for her complaints." (Tr. 22). Plaintiff testified that her migraines "have gotten worse over the past few years" (Tr. 36), and had been lasting for 3 to 5 days for about three years (Tr. 44). But after her AOD of February 1, 2005, there is no record showing that she sought treatment for migraine headaches before she began emergency room visits in October 2006.[15] And Plaintiff testified that she visited with her primary care physician "about once a month" (Tr. 55), yet her records show no visits from August 2006 until March 2007, which was a visit for a "woman health physical exam" (Tr. 339). Overall, the ALJ has provided substantial evidence to support his RFC finding.

**B.    Credibility**

Plaintiff challenges the ALJ's finding regarding her credibility, claiming that he "did not perform an adequate analysis of the threshold question regarding [her] subjective allegations of pain, but instead moved directly to a step two analysis of credibility." (Pl.'s Br. 27). In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence

---

[14]Neither Plaintiff's medical records nor her testimony established that she would "need to stop working for less severe migraines during the work day" as Plaintiff claims. (Pl.'s Br. 26).

[15]Plaintiff testified that she got injections at a Florida hospital, but could not "think of the name of it" (Tr. 44-45) and she did not mention either the migraine headaches, or treatment therefor, in her concurrent Disability Report (see Tr. 101-02)).

12

of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir.1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4).

The regulations specifically provide that a claimant's symptoms "will not be found to affect [his] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." Id. § 404.1529(b). Such "medical signs and laboratory findings . . . must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Id.

The ALJ here found that Plaintiff's "medically determinable impairments" – i.e., her neck and back pain and migraines – "could reasonably be expected to produce the alleged symptoms." (Tr. 19). Before this finding, he discussed Plaintiff's allegations that she has difficulty walking and getting out of bed. (Tr. 18). She said that her migraines lasted four to six days and occurred every other week. Plaintiff complained that she could sit or stand for no more than fifteen to twenty

13

minutes, then must change position. (Tr. 19). She stated that she had trouble lifting a gallon of milk and must use both hands in so doing. Plaintiff said that, on bad days, she does not get out of bed.

As to Plaintiff's "medically determinable impairments," the ALJ then discussed her medical records. He noted that Plaintiff's x-rays showed age-appropriate spondylosis. (Tr. 19). Her lumbar spine MRI showed bulging, albeit minimal, at L4-L5 and L5-S1, with facet arthropathy at L5-S1 and no stenosis at L4-L5. Plaintiff's cervical spine MRI showed osteophytes, although mild, at C5-C6 and C6-C7 with no stenosis. Neurologist Afong diagnosed Plaintiff with lumbalgia and cervicalgia. Neurologist Kamel diagnosed Plaintiff with musculoskeletal pain. (Tr. 20). Various physicians prescribed Plaintiff medications for her migraines, and she received injections at the emergency room for treatment thereof. (Tr. 21-22). Immediately following this discussion, the ALJ enters into his analysis of Craig's step two. Accordingly, the undersigned finds that the ALJ adequately supported his finding at step one of the Craig analysis.

Plaintiff's objection here stems from the discussion of Magistrate Judge Bruce Howe Hendricks in an unpublished case as to the use by some ALJs of "boilerplate" when addressing Craig's step one. See Harris v. Astrue, C/A No. 8:06-3171-DCN-BHH (D.S.C. Feb. 6, 2008). But even if Judge Hendricks's case constituted precedent, it is inapposite to the case sub judice. It appears that Judge Hendricks was particularly bothered by the Harris ALJ's use of "some" in her finding:

> [M]ore critically, the ALJ indicates that the plaintiff's medical impairments "could reasonably be expected to produce *some* of the symptoms . . . ." (R. at 16.) The Court is fairly certain that *Craig* requires, at least, something more than this conclusion. . . . The Court simply cannot review the ALJ's conclusion, at step one, that the impairments could be expected to produce "some" symptoms. It is simply too vague and does not advance the purposes of the analysis outlined in *Craig*.

14

Id. at 14 (second alteration in original). Further, the ALJ's discussion in Plaintiff's case, as summarized above, has convinced the undersigned that he "reflected attention, no matter how generically, to the first step" of Craig. Id. Thus, Plaintiff's claim here fails.

Plaintiff further contends that the ALJ's Craig step two analysis relied heavily on the lack of objective evidence.[16] But the ALJ added, "The notes of her treating physicians generally describe a course of improvement with treatment for the specific complaints [Plaintiff] made at any particular time." (Tr. 22). Plaintiff professes ignorance of statements to which the ALJ refers, but the decision identifies some of them.

Plaintiff received treatment at The Back Center during January through June of 2005. She underwent epidural injections on April 1 and 8, but reported on April 26 that she had "had really no relief, possibly like a day or two." (Tr. 184-86; see also Tr. 19). Yet when Plaintiff saw Dr. Datta, a surgeon at The Back Center, she told him that the injections "lasted for about a month giving her significant improvement in her low back symptoms." (Tr. 183; see also Tr. 20). Her neck pain even remained "at a tolerable level." (Tr. 183).

As a second example, the ALJ noted (Tr. 20) Plaintiff's visit to the Ville Chiropractic Group in June 2005. Plaintiff told Susan Ville, D.C., that she had been treated by Shawn Egan, D.C., in January 2005 "without any significant change." (Tr. 229). But Egan's treatment records noted increased in cervical and lumbar ranges of motion; decreased cervical, thoracic and lumbar spinal spasms; decreased point tenderness over the cervical facets and thoracic spine; and decreased tender

---

[16]Plaintiff states that "Fourth Circuit precedent does not allow a rejection of subjective allegations of pain based on a lack of objective evidence once th[e] step one threshold is crossed." (Pl.'s Br. 29). She fails to identify which precedent is relied upon. Craig, on the other hand, expressly holds that "objective medical evidence and other objective evidence" are "*crucial* to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work" – precisely the analysis that occurs at step two. 76 F.3d at 595 (emphasis added).

15

soft tissue in the cervical spine. (Tr. 169-70). Plaintiff also told Dr. Afong that Egan's treatment helped her neck. (Tr. 191).

Plaintiff's experience with the Ville Chiropractic Group was similar. (See Tr. 20). By her sixth treatment, Robert Ville, D.C., noted that Plaintiff was "showing some slow steady improvement." (Tr. 224). By visit ten, she had "overall improvement." (Tr. 220). Plaintiff, however, told Dr. Kamel, "She had chiropractor manipulation as well as acupuncture, which only helped for a few hours." (Tr. 233).

Plaintiff also counters that her testimony was that her condition improved temporarily, but then would worsen, citing to transcript pages 37 through 42. The undersigned is not persuaded. At page 37, Plaintiff testified that her RFA treatment "helped [her pain] a little bit but not significantly." At page 41, she added that RFA "[f]or a very short period of time" reduced her pain "from a nine to about a six." On December 6, 2006, however, she reported that RFA treatments performed in July and August 2006 had improved pain in the lumbosacral facet region on the left and the range of motion of the lumbar spine; decreased the frequency of her cervicogenic headaches; and improved her cervical range of motion. (Tr. 255). Not until February 27, 2007, did Plaintiff complain of "gradual return" of her right-sided low back pain after her August 2006 treatments. (Tr. 345).

In May 2007, Plaintiff reported that March 2007 treatment "helped her tremendously." (Tr. 309). On July 24, 2007, she said that "[h]er left low back pain has completely resolved." (Tr. 281). At her last record visit, on December 6, 2007, Dr. Dan Martin noted that Plaintiff's pain in the lumbosacral facet region had improved on the left; her lumbar spine range of motion had improved; the frequency of her cervicogenic headaches had decreased; and her cervical range of motion had improved. (Tr. 255). Plaintiff's claim here is thus rejected.

Plaintiff complains that the ALJ failed to provide more discussion on how her pain affects her "routine of life," see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994), but such discussion would have been based upon Plaintiff's statements, and the ALJ discounted Plaintiff's credibility. Nor do Plaintiff's medical records support the premise that her life was consumed with her medical treatment. As the ALJ pointed out (Tr. 21, 22), there were literally months when Plaintiff had no treatment at all (7/2-11/7/05; 1/3-6/8/06). Plaintiff's medical records fail to support her testimony that she had migraines every other week that lasted for four to six days and required emergency room treatment each time. See pp. 11-12, supra.

As to Plaintiff's use of narcotic medications, just two weeks before her AOD, Plaintiff was taking only Tylenol. (See Tr. 191). Although she received prescriptions for a narcotic pain reliever from The Back Center, there is no indication that Dr. Kamel continued this prescription. (See Tr. 231, 234). Plaintiff was taking only Motrin, with "moderate control" when, in June 2006, she started care with the Family Medical Center at the Medical College of Georgia ("MCG"). (See Tr. 403). In July 2007, Plaintiff reported taking only a cholesterol medication. (See Tr. 281). Although she began treatment at MCG's pain clinic in July 2006, not until October 2007 did her caregiver there prescribe a narcotic pain reliever. (See Tr. 264). Two months later, however, at Plaintiff's last record visit, there is no indication that she was receiving a narcotic pain reliever. (See Tr. 255-56).

Plaintiff mentions her single complaint to a caregiver that she could sit, stand and walk for only fifteen minutes. (See Tr. 229). Yet routinely her caregivers described her gait as normal; her muscle strength, full; her reflexes, two-plus and symmetric; her sensation, intact; and her straight-leg raising, negative. Plaintiff was even able to walk on her heels and toes. (See Tr. 183; see also Tr.192).

Plaintiff ends with the assertion that "[t]he ALJ evaluation is largely absent regarding any step two finding relating to pain and the impact on the Plaintiff's functional capacity." (Pl.'s Br. 33). The undersigned again disagrees. In addition to the reasoning discussed above, the ALJ relied upon (Tr. 22):

> • "the generally stable program of her treatment" and conservative treatment of her spinal complaints, see Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (finding conservative treatment and no surgery consistent with discrediting plaintiff's subjective complaints); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (finding plaintiff's course of conservative treatment was substantial evidence to support the ALJ's decision to discredit plaintiff's subjective complaints);
> • "inconsistent information as to her treatment history," see SSR 96-7p, 61 Fed. Reg. 34,483-01, 34486 (a strong indication of credibility is the consistency of the claimant's statements);
> • a history of skilled work in spite of suffering from migraines since childhood, that Plaintiff drove herself the one-hour to the hearing, and that she has full custody of her nine-year-old granddaughter, see Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (inconsistencies between a claimant's subjective complaints and her activities diminish her credibility).

Plaintiff has challenged none of these reasons and, plainly, the ALJ did not rely overwhelmingly on the absence of objective evidence, as Plaintiff repeatedly suggests. Overall, the undersigned finds that the ALJ has provided substantial evidence to support his finding of Plaintiff's credibility.

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the

Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

    RECOMMENDED that the Commissioner's decision be affirmed.

Joseph R. McCrorey
United States Magistrate Judge

June 24, 2010
Columbia, South Carolina